# IN RE BLACKMORE.

---

PATENTS; PATENTABILITY; PROCESS.

1. The production of aldehyde by selective oxidation of the hydrogen of a hydrocarbon is old in the art; and there can, therefore, be no in-vention in the idea that formic aldehyde can be thus produced, the chemical reaction being well known to chemists; and it is not a new discovery that the temperature must not be above the dissociat-ing point of the aldehyde desired.

2. Where there is general agreement among the tribunals of the Patent Office that a process for making formic aldehyde has been anticipated either by patents or by publications in scientific journals, this court will not be disposed to disturb their unanimous conclusion that the process is not patentable.

3. The fact that an applicant for a patent for a process for making formic aldehyde has in his possession an apparatus suitable for the production of formic aldehyde in the manner set forth in his specification in larger quantities than any apparatus set forth in existing patents has no bearing upon the patentability of his process, so long as the process and the results obtained are the same in each instance.

4. A patent should not be issued where the alleged invention is a mere modification of the principle involved in former inventions or discoveries. A valid patent cannot be issued for an improvement which is simply a new application of knowledge already familiar to those skilled in the art. (Following *Re Faber*, 31 App. D. C. 531.)

No. 553. Patent Appeals. Submitted May 11, 1909. Decided June 1, 1909.

HEARING on an appeal from a decision of the Commissioner of Patents, rejecting an application for a patent. *Affirmed.*

The facts are stated in the opinion.

*Mr. C. L. Parker* for the appellant.

*Mr. Frederick A. Tennant* for the Commissioner of Patents.

Mr. Justice VAN ORSDEL delivered the opinion of the Court:

This is an appeal by Henry S. Blackmore from a decision of the Commissioner of Patents, refusing a patent to the appellant for an alleged new process of making formic aldehydes. The decision of the Commissioner affirms the decision of a majority of the Board of Examiners in Chief, which, in turn, affirms the decision of the Primary examiner. A patent was refused on the ground that it was covered by certain existing patents, and had been anticipated in a number of publications referred to in the record. The appealed claims are as follows:

"1. The process of producing aldehyde, which consists in

oxidizing a gaseous or vaporous substance containing ·carbon and hydrogen, and maintaining the same at a temperature below the dissociating point of the aldehyde desired by absorbing the heat evolved.

"2. The process of producing aldehyde, which consists in exposing hydrocarbon in a volatile or gaseous state to the action of oxygen at a reacting temperature.

"3. The process of producing aldehyde which consists in performing a reaction between a hydrocarbon and oxygen at a temperature maintained below the dissociating point of the aldehyde produced.

"4. The process of producing aldehyde which consists in conveying hydrocarbon and oxygen in contact with a heated surface and collecting the product thereof.

"5. The process of producing aldehyde which consists in performing a reaction between hydrocarbon and oxygen, and while removing the excess of heat during the transformation.

"6. The process of producing aldehyde which consists in inducing a reaction between hydrocarbon and oxygen, and abstracting the excess heat therefrom, thus preventing elevation of temperature above the dissociating point of the product desired.

"7. The continuous process of producing aldehyde which consists in passing a current of gas containing hydrocarbon and oxygen in contact with a heated surface capable of inducing reaction, abstracting the excess of heat therefrom, and thus maintaining the temperature below the dissociating point of the product desired, and finally condensing and collecting the product, substantially as herein described.

"8. The process of producing formic aldehyde which consists in exposing methane to the action of oxygen at a reacting temperature.

"9. The process of producing formic aldehyde which consists in oxidizing methane at a temperature maintained below the dissociating point of formic aldehyde.

"10. The process of making aldehyde which consists in oxi-

dizing hydrocarbon while maintaining the temperature below the dissociating point of aldehyde by refrigeration.

"11. The process of making aldehydes which consists in inducing a sphere of reaction between hydrocarbon and oxygen, regulating the supply of oxygen in proportion to oxidize the hydrogen of the hydrocarbon in part, and maintaining the temperature at a point at which oxygen has an affinity for the hydrogen of the hydrocarbon in preference to carbon and below the dissociating point of the product desired by subtracting the heat evolved during the oxidation process.

"12. The process of removing hydrogens from hydrocarbon and substituting nonmetallic elements therefor, which consists in inducing a reaction or combination between the hydrogen of hydrocarbon and supplying the nonmetallic element thereto in proportion to the amount of hydrogen desired to remove or substitute, and maintaining the temperature of the reacting ingredients at a point at which the hydrogen of the hydrocarbon has a selective affinity for the nonmetallic element, and below the point at which the product desired is dissociated by the action of heat."

The process is described in the opinion of the Commissioner as follows: "The alleged invention consists in a process for producing formic aldehyde by a limited oxidation of a hydrocarbon, and in claim 8 the specific hydrocarbon methane is mentioned. This process is carried out by an apparatus consisting of a mixing chamber with which two concentric inlet pipes communicate, air being introduced through one of the said pipes and the hydrocarbon through the other. The mixing chamber has across it two separated gauze diaphragms, between which the reaction forming aldehyde takes place. Electric heaters are disposed within this chamber for the purpose of heating the mixture of hydrocarbon and air sufficiently to start the reaction, and it is alleged that, after the reaction is once started, the excess of heat caused by the exothermic reaction is conducted away from the mixing chamber by the walls of the chamber and the gauze diaphragms referred to. The gauze diaphragm nearest to the inlet pipes is said to be a flash preventor as well

as an absorbent of the excess of heat. In operation a mixture of air and hydrocarbon is supplied continuously, and there is a continuous production of aldehyde in the combustion chamber, which is carried off to a cooling and condensing chamber."

The claims of appellant seems to be based upon the use of any hydrocarbon, specifically, however, referring to methane (marsh gas) or natural gas, 96 per cent. of which is marsh gas, as the substance from which the aldehyde is produced, and a method of refrigerating by which the temperature is maintained below the dissociating point of the aldehyde produced. The production of aldehyde by selective oxidation of the hydrogen of a hydrocarbon is old in the art. There could, therefore, be no invention in the idea that formic aldehyde could be thus produced. The chemical reaction was well known to chemists. It was not a new discovery that the temperature must not be above the dissociating point of the aldehyde desired.

The method of temperature control is the gist of appellant's alleged invention. It is insisted by appellant that the old method of controlling the temperature by limiting the proportion of air to alcohol vapor (the substance generally used prior to appellant's entry into the field) to prevent too high a temperature in the reaction chamber was subject to serious criticism, in that it resulted in a diminution of output, waste of hydrocarbon, impurity, and instability of product. This process of cutting off a portion of the air to check the evolution of heat is likened by counsel for appellant to the closing of a damper in a stove to check the fire. The shutting out of the oxygen in the air from the stove limits combustion within, just as in the former process the restriction of the volume of air admitted regulated the heat in the reaction chamber. In appellant's process, the temperature is maintained in the reaction chamber below the dissociating point through the abstraction of heat by means of what he terms the refrigerating process. It is insisted that, by this method, there is increased rapidity of the reaction, all the hydrocarbon present is utilized, the purity and stability greatly improved, and the amount of the product increased.

The tribunals of the Patent Office have cited many references

in which they held that the process claimed has been anticipated either by patents or by publications appearing in scientific journals. Inasmuch as there is a general agreement in the Patent Office on this point, we are not disposed to disturb the unanimous conclusion of three tribunals composed of men skilled in the highly technical distinctions here presented. It would seem, however, from an examination of these references, that appellant did nothing more than to modify a process of production well known. The production of formic aldehyde, both from methyl alcohol and hydrocarbons, was well known, and appellant's method of extracting heat from the reaction chamber is embraced in the British patent to Trillat, as well as widely discussed in scientific journals by men skilled in the art. The Trillat patent and a number of these articles are cited and discussed at length in the opinion of the Commissioner of Patents. They show, in our judgment, a clear anticipation of appellant's alleged process. Referring to the Trillat patent, the Commissioner said: "It has for many years been the practice to produce formic aldehyde from methyl alcohol by a limited oxidation, either by treating the methyl alcohol with air or other oxidizing agent. This is shown in the articles by Trillat, cited, and also by the British patent to Trillat. In the patent to Trillat an apparatus is disclosed by which the process of forming formic aldehyde is continuously carried on, the exothermic character of the reaction being sufficient to keep the copper diaphragm in the combustion chamber at a red heat, and thus serving to maintain the required temperature for the reaction. The rate of introduction of the air assists in abstracting the heat sufficiently to maintain the temperature in the combustion chamber below the point of dissociation of the formic aldehyde; otherwise the resulting product could not be the substance sought." In Landw. Versuch Stationen, another reference, the apparatus for the production of formic aldehyde discloses a process by which the ingredients are mixed and passed through copper diaphragms, which perform the same function of preventing flash and abstracting heat as appellant's device.

No claim is made for the apparatus in which the process is

conducted, and for which appellant already has a number of patents. Referring to the apparatus, the Board of Examiners said: "The records of this office show that the appellant has been granted five patents for processes disclosing the identical apparatus disclosed in the present case. These patents are Nos. 769,585, 778,099, 809,900, 817,690, and 828,268. Each of these patents and another without drawings (No. 686,022, reissued as No. 11,995) are based primarily upon the idea of removing the heat of reaction so as to keep the temperature below the dissociating point of the substance produced. In these patents the idea was applied to different specific reactions, but each includes the process of removing the heat. In view of these patents we are of the opinion that there is no room for a patent in the present case, even if the process were otherwise patentable. A new or different specific use of the old idea involves no new inventive thought, but is a mere obvious application or carrying forward of the old idea. It is merely the use of the old invention upon a new occasion."

The fact that appellant has in his possession an apparatus suitable for the production of formic aldehyde in the manner set forth in his specification in larger quantities than any apparatus set forth in the references cited is immaterial, and has no bearing upon the patentability of the process, so long as the process and the results obtained are the same in each instance. The process is the same, whether the yield be great or small; and the process alone is the subject-matter of appellant's claims. The use to which appellant has converted his patented apparatus is to perform a process every step of which is old in the art. This conclusion is supported by the decision of this court in the case of *Re Faber,* 31 App. D. C. 531, where we said: "A patent should not be issued where the alleged invention is a mere modification of the principle involved in former inventions or discoveries. It is well settled that a valid patent cannot be issued for an improvement which is simply a new application of knowledge already familiar to those skilled in the art. *Ryan* v. *Hard,* 145 U. S. 241, 36 L. ed. 691, 12 Sup. Ct. Rep. 919; *Grant* v. *Walter,* 148 U. S. 547, 37 L. ed. 552, 13 Sup. Ct. Rep. 699;

*Market Street Cable R. Co.* v. *Rowley,* 155 U. S. 621, 39 L. ed. 284, 15 Sup. Ct. Rep. 224. The record, we think, discloses that appellant's alleged invention contains nothing new to those skilled in the art. The application of the principles involved in the issue are obvious to those familiar with the use of such bandages in connection with the performance of surgical operations. Where this is apparent, no patent should issue. As stated in *Hollister* v. *Benedict & B. Mfg. Co.* 113 U. S. 59, 28 L. ed. 901, 5 Sup. Ct. Rep. 717: 'It is but the display of the expected skill of the calling, and involves only the exercise of the ordinary faculties * * * and the facility of manipulation which results from its habitual and intelligent practice; and is in no sense the creative work of that inventive faculty which it is the purpose of the Constitution and the patent laws to encourage and reward.' "

The decision of the Commissioner of Patents is affirmed, and the clerk is directed to certify these proceedings as by law required. *Affirmed.*