TONDUER *v.* CHAMBERS *et al.*

(*Circuit Court, W. D. Pennsylvania.* January 10, 1889.)

1. PATENTS FOR INVENTIONS—VALIDITY—FALSE STATEMENT AS TO CITIZENSHIP.
It is not a valid defense to a suit for the infringement of letters patent granted under the Revised Statutes that the patentee in his application therefor made oath that he was a citizen of the United States, when he was not; such misstatement as to his citizenship having been made innocently, through mistake, without any improper design whatever.

2. SAME—PATENTABILITY—GLASS-ANNEALING PROCESS.
Letters patent No. 258,156, dated May 16, 1882, for improvements in glass-annealing furnaces, granted to Cleon Tonduer, sustained, and the defendants adjudged to infringe the same. Following *Tondeur* v. *Stewart,* 28 Fed. Rep. 561.

In Equity. Bill for infringement of patent.
*W. Bakewell & Sons,* for complainant.
*George Harding* and *George J. Harding,* for respondents.

ACHESON, J. This is a suit for the alleged infringement by the defendants of letters patent No. 258,156, for improvements in glass-annealing furnaces, granted to Cleon Tonduer, the plaintiff, on May 16, 1882; a patent which this court already has had occasion to consider in the case of *Tondeur* v. *Stewart,* 28 Fed. Rep. 561, where there was a decree in favor of the patentee. The present defendants, however, were not parties to that suit, and as some new proofs have been adduced by them, this case has been heard as if none of the questions involved had ever been passed on, and the conclusions I am about to announce have been reached after a re-examination of the grounds of the former decision, and a careful consideration of the case in all its branches.

The patent discloses a device for transporting the sheets of glass from the flattening wheel to the discharging end of the annealing chamber, tunnel, or leer, consisting of two sets of parallel bars (designated $d$ and $d'$) extending lengthwise through the leer, and elevated above the bottom thereof, the bars of the respective sets being arranged side by side, and alternately between each other, one set reciprocating longitudinally and conveying the glass, and the other set supporting the glass at certain times, whereby the sheets of glass are supported in and carried through the leer, in substantially the same horizontal plane. The specification shows and describes a series of transverse shafts to support the two sets of bars, each shaft being provided with two sets of arms, $E'$, and $E'''$, the arms, $E'$, carrying grooved wheels, upon which the reciprocating or transmitting bars, $d'$, rest, and whereby they have a free rectilinear motion back and forth in the leer; while the supporting bars, $d$, are made fast to the arms, $E'''$, by a hinge-joint. By means of a lever connected with one of the shafts, one set of bars is raised, and the other is lowered simultaneously to the extent altogether of about one inch, and thus the glass is shifted from one set of bars to the other. But, touching the motion of the bars, $d$, the specification states, and the fact is, that it "is very small," (being limited to the short distance the lever moves the arm, $E'''$,) and "has no effect on the progress of the glass through the tunnel." The described operation of the device is this: The ends of the reciprocating bars, $d'$, having been pushed into the flattening furnace, and a sheet of glass placed thereon, the operator at the outer end of the leer draws the bars, $d'$, outward, the width of the sheet. Then, by a motion of the lever, he lowers the bars, $d'$, and raises the bars, $d$, and thus the sheet is transferred from the bars, $d'$, to the bars, $d$, upon which it rests while he pushes the bars, $d'$, back into the furnace. He then reverses the lever, and the bars, $d'$, take up the sheet. A second sheet is then placed on the inner ends of the bars, $d'$, and the two sheets are moved down the leer, and deposited on the bars, $d$, and the bars, $d'$, are again pushed back. This operation is repeated until a series of sheets extends throughout the leer, when they are discharged from the outer end, one by one, at each reciprocal movement of the bars, $d'$. The patent has five claims, but infringement of the first claim only is here asserted. That claim is as follows:

"(1). The combination of the bars, $d$, $d'$, arranged side by side, and alternately between each other, the set, $d$, supporting the sheets of glass while the bars, $d'$, are pushed towards the leer or flattening wheel, $a$, and the set, $d'$, supporting the sheets of glass, and moving them onward and through the tunnel, substantially as set forth."

The answer denies that the plaintiff was the first and original inventor of what was patented to him, and also denies infringement.

To sustain the former defense the defendants rely, not only upon the patents to Bievez and Bowen, which were mainly relied on to defeat the suit in *Tondeur* v. *Stewart, supra,* but also upon letters patent dated November 25, 1873, granted to J. B. Boulicault, and several French patents, particularly the patent to A. M. Bouvy. Now, in respect to the

first two mentioned patents, I can discover no good reason for departing from the conclusion upon the question of anticipation expressed in the opinion of the court in the earlier case. Of the Boulicault patent it must be said that the drawings and specification, in so far as they have any relation to the particular matter here in controversy, are obscure. Moreover, there is some positive testimony tending to show that the construction thereby contemplated was a failure in practice; and so, also, there is evidence—especially the testimony of Henry L. Dixon, a furnace-builder and practical expert—which strongly impresses the conviction on my mind that the Bouvy device is impracticable for the proper annealing of sheets of glass. But, aside from these considerations, I think it can be confidently affirmed that not one of the several patents set up as anticipatory shows two sets of bars, one of them (the conveying set) having a reciprocating rectilinear motion, and the other set supporting the glass while the first set is pushed back into the furnace, which is an essential characteristic of the plaintiff's device. Notwithstanding, then, what prior inventors may have achieved, I am of the opinion that Tonduer's device possesses patentable novelty. And this conclusion is strongly sustained by the plaintiff's proofs,—abounding and uncontradicted,—showing the great utility of his patented invention, and its immediate and very general adoption. The leers which had been commonly in use were the car-leer, in which the sheets of glass are transported through the annealing tunnel on cars, and the hearth-leer, in which the sheets are moved along the floor of the leer, resting thereon except at the instant of transfer from place to place. But the plaintiff's improvement wrought a great change in the practice of the art to which it appertains. Glass manufacturers generally have abandoned the old methods of transporting the glass through the annealing tunnel, and have adopted the plaintiff's device, and a large number of them in various parts of the country have taken licenses from him; and, undoubtedly, the plaintiff's device secures more uniform and thorough annealing,—resulting in a great saving of glass from breakage,—and also quicker work, than any device or method previously employed for the like purpose. Now, while such facts as these may not be decisive of the question, they certainly go far to establish patentability, and to justify the determination of the court as above expressed. *Smith* v. *Vulcanite Co.*, 93 U. S. 486; *Loom Co.* v. *Higgins*, 105 U. S. 580; *Valve Co.* v. *Valve Co.*, 113 U. S. 158, 179, 5 Sup. Ct. Rep. 513.

Coming, then, to the question of infringement, we find that the defendants use two sets of elevated bars, and that the only difference (alleged to be material) in construction or mode of operation between their device and that described in the plaintiff's specification is, that in the defendant's leers the bars which support the sheets of glass while the reciprocating bars are pushed towards the flattening wheel are stationary, and the vertical movement for shifting the glass from one set of bars to the other is performed by the reciprocating bars alone. Is this difference sufficient to relieve the defendants from the charge of infringing the first claim of the patent? Certainly the variation is practically un-

important. As was said in *Tondeur* v. *Stewart, supra,* most clearly the defendants' stationary bars perform the identical supporting function which the plaintiff's bars, $d$, perform,—the only function, be it observed, assigned to those bars by the first claim. Then, again, it is evident that for the supporting of the sheets of glass by the bars, $d$, and the supporting and moving of them by the bars, $d'$, (the particular matters covered by the first claim,) it is altogether immaterial whether the vertical movement is divided between the two sets of bars, or is executed by the bars, $d'$, alone. The difference is not in principle, but in mere arrangement. In all essential particulars the plaintiff's described device and that employed by the defendants are alike. They operate in substantially the same way, and produce the same beneficial results. This, however, is not all; for not only do the defendants use and enjoy the substance of the plaintiff's invention, but their bars come within the very terms of the first claim of the patent. Therefore, to escape the charge of infringement, the defendants are under the necessity of contending that the first claim of the patent shall be construed to mean two sets of movable elevating bars. To sustain this view, much stress is laid upon certain passages of the specification which treat of the shifting movement of the bars, $d$, and $d'$, and also upon the disclaimer to be found in the patent, in the words following :

"I am aware that movable bars and fixed temporary rests for the glass have long been in public use to move sheets of glass through an annealing tunnel; therefore I do not claim these."

Now, it may well be that the patentee considered the simultaneous change in the elevation of the two sets of bars as the most advantageous mode of shifting the glass from set to set, and this feature he has taken care to cover by the second claim of the patent. But the first claim calls for no such limitation as is insisted on, and its language is free from ambiguity. Why, then, should the court import into the claim a qualification not expressed,—something wholly unnecessary to the therein described operation,—when the only practical effect would be to deprive a worthy inventor of the benefit of his patent?

The disclaimer was considered in the case of *Tondeur* v. *Stewart, supra,* and the judgment of the court was against giving to it the effect here contended for. To that conclusion I must adhere. I will not repeat, or much enlarge on, what was said upon this subject in the former opinion. The disclaimer is to be read with reference to the prior state of the art, and it may and ought to be construed so that it may harmonize with the plainly-expressed terms of the first claim of the patent. The claim follows directly upon the heels of the disclaimer, "but what I do claim is: (1) The combination of the bars, $d$, $d'$," etc. The specification describes two sets of bars,—one set having a temporary supporting function, and the other set supporting and moving the sheets of glass through the leer. The first claim of the patent is for the combination of these two sets of bars arranged and co-operating in the manner and for the purpose defined. The claim should be interpreted with reference to the actual invention. The reasonable presumption is that, having a just

right to cover and protect his whole invention, the patentee intended to do so. *Winans* v. *Denmead*, 15 How. 341. The construction of patents should be liberal, so as to secure to inventors what they have created, if it can be done consistently with the language used. *Turrill* v. *Railroad Co.*, 1 Wall. 491; *Klein* v. *Russell*, 19 Wall. 433. Guided by these just principles, I must reject the construction the defendants would put on the first claim of the patent, and hold them to be infringers thereof.

But the defendants make the further defense (which was not set up in the prior suit) that the letters patent sued on are null and void, upon the ground that in the application for his patent the plaintiff made oath that he was a citizen of the United States, which he was not. The answer does not allege, nor is there any evidence to indicate, that the plaintiff was guilty of any fraud, or that his oath was willfully false. On the contrary, it satisfactorily appears that he acted under an honest mistake, and with no improper design whatever. The plaintiff left Belgium, his native land, in the year 1881, and came to the United States with the avowed intention of making this country thenceforth his permanent place of residence and citizenship; and he ignorantly supposed that by virtue of his residence, and the residence of his family, here, he became a citizen. This mistake he did not discover until a long time after the grant of his patent. Now, the question raised, it will be perceived, is not whether the letters patent are voidable, for the cause assigned, at the suit of the government. The position taken is that the patent is a nullity. In support of the proposition, the defendants cite the case of *Child* v. *Adams*, 1 Fish. Pat. Cas. 189, in which a similar defense was sustained by Judge GRIER. But that case arose under and was governed by the patent act of 1836, which allowed the grant of letters patent to aliens only upon peculiar conditions, to which citizens were not subject. 5 St. at Large, 117. By that act the patent fee payable by a citizen was $30 only, whereas an alien was required to pay at least $300, and, if a British subject, $500; and by the stringent language of the act the fee was to be paid before the application for a patent could be considered by the commissioner. Section 9. Then, again, an alien patentee was compelled "to put and continue on sale to the public, on reasonable terms, the invention or discovery for which the patent issued." Section 15. It was, therefore, under that act, of the highest importance that the applicant should truly disclose his citizenship; and section 6 required that before any inventor should receive a patent he should "make oath, * * * of what country he is a citizen." The decision cited was expressly put upon the ground that an alien, whether through ignorance or intention, falsely swearing that he was a citizen, in order to procure a patent, not only failed to perform a condition upon which his right to a patent depended, but committed a fraud upon the government. But the law governing the present case, *i. e.*, the patent act of 1870, as embodied in the Revised Statutes, abolished all such discriminations against aliens, and placed them upon the same footing as citizens, in respect to the grant of letters patent for inventions, and the enjoyment of the privileges thereby secured. Rev. St. §§ 4886, 4920,

4934. Therefore, under the law as it stood when the plaintiff applied for and obtained his patent, the mistake in his statement as to his citizenship operated, and could operate, neither to his advantage, nor to the detriment of the government or the public. Furthermore, it is well worthy of notice that while section 4892, Rev. St., requires the applicant for a patent to "make oath that he does verily believe himself to be the original and first inventor," etc., in respect to citizenship, the language is, "and shall state of what country he is a citizen." This change in phraseology seems to be intentional and to dispense with the necessity of an oath as to citizenship. At any rate, the citizenship of the applicant for a patent is no longer a matter of any real importance, and a mistake touching the same is harmless. I feel quite justified, then, in declining to apply to this case the rule which prevailed in *Child* v. *Adams*, *supra*. In the absence of express statutory provision avoiding a patent for a misstatement as to citizenship, it would be going to an extreme length —and, indeed, in the face of well-settled equitable principles—for the court to hold that a mere mistake in that regard, innocently made, and working no sort of harm, should have such effect. In *Manufacturing Co.* v. *Canning Co.*, 27 Fed. Rep. 78, where it was urged that a patentee was estopped to deny that his American patent was for the same invention before patented by him in a foreign country, by reason of his having made oath that such was the fact in his application for the former, it was held that, if the inventor was laboring under a mistake as to this point, his rights ought not thereby to be defeated or abridged. At an early day Judge STORY held, in *Whittemore* v. *Cutter*, 1 Gall. 429, that an error in the form of the oath of an applicant for a patent was immaterial; and in *Crompton* v. *Belknap Mills*, 3 Fish. Pat. Cas. 536, the court said that even the entire failure to make the oath would not invalidate the patent. Upon the whole, then, I am of the opinion that the misstatement in the plaintiff's oath as to his citizenship is not an available defense to this suit. Let a decree be drawn in favor of the plaintiff.