# RYAN v. HARD.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF NEW YORK.

No. 346. Argued April 28, 1892. — Decided May 16, 1892.

Letters patent No. 241,321, granted May 10, 1881, to Charles H. Dunks and James B. Ryan, for improvements in swing woven-wire bed-bottoms, are invalid for want of patentability; all that was done being to suspend a fabric well known as a bed-bottom in substantially the same manner that other fabrics used for that purpose had been suspended.

THE case is stated in the opinion.

*Mr. John B. Gleason* for appellants.

242 OCTOBER TERM, 1891.

*Mr. James B. Jenkins* for appellees.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

This is a suit in equity, brought April 7, 1887, in the Circuit Court of the United States for the Northern District of New York, by James B. Ryan, Francis A. Hall, William R. Cougle and Richard W. Elliott, against Charles H. Hard, John J. Crawford and Henry D. Hard, for an alleged infringement of letters patent No. 241,321, granted May 10, 1881, to Charles H. Dunks and James B. Ryan for improvements in swing woven-wire bed-bottoms. The alleged infringement consisted in the sale by the defendants of woven-wire bed-bottoms, containing the patented improvements. The answer of the defendants set up, among other things, the want of novelty and of patentability. Issue was joined and proofs were taken, and the Circuit Court, held by Judge Coxe, on August 13, 1888, gave an opinion in favor of the defendants, (35 Fed. Rep. 831,) in pursuance of which a decree was entered dismissing the bill.

The specification of the patent says:

"C represents a central section of the ordinary woven-wire fabric in common use in bed-bottoms. This fabric is attached, at either or both ends, to a swinging cross-bar, which, in turn, is suspended from one of the end rails of the bedstead. By preference we construct the swinging bar in two parts — a lower portion, D, formed of wood, to which one end of the woven fabric is secured by means of suitable pins, or otherwise, and an upper portion, D', provided upon its outer edge with a series of holes, *d*, the upper and lower portions being secured to each other by rivets, bolts or other analogous devices. Thus the upper part may be made to assist in securing the end of the woven fabric, to cover the end of the fabric, and thus protect the mattress from undue wear, and also as a means by which to attach the springs E; links or other devices employed to connect said swinging bar with the end rail of the bedstead.

"E E represent a series of spiral springs, each connected at one end to the swinging bar, and at the other end to the end

rail of the bedstead, preferably by means of an interposed supplemental bar or rail, F, which, in this instance, we have represented as being a metal bar provided with holes upon one edge for the attachment of the springs, and provided, also, upon the other edge with holes, *f*, adapted to receive pins, by means of which said bar F can be attached, either to the end rail of the bedstead or to a separate rail, G, which, in turn, is secured to the end rail of the bedstead.

"In Fig. 1 we have shown both methods of attaching the bar F to the bedstead, it being attached to the foot-rail B' by means of a series of bolts, hooks or pins, *b*; and in case pins are inserted in the rail B' for this purpose, we prefer to incline them backward, in order to prevent the bar F from being accidentally detached when in use; or the pins may be provided with heads, the holes in the end rail of the bedstead being inclined inwardly at their lower ends, when the tension of the springs E will keep the form in position.

"When the bar G is employed its ends may be notched to engage with the vertical posts of the bedstead, or with cleats or ribs secured to the inner faces of the posts or of the side rails, as the construction of the bedstead shall indicate as being most convenient; or the end rail of the bedstead may be provided with an inwardly projecting rib having pins or hooks corresponding to those marked *b*; or hooks may be attached to and project from the inner face of the rail in proper position to receive the bar F.

"Referring to Fig. 4, H H are the side rails, and I I' the end rails, of a bed-bottom adapted to be applied to a bedstead of any ordinary or approved construction, and rest upon the cleats with which such bedsteads are usually provided for the purpose of supporting a detachable bed-bottom.

"In this construction we prefer to dispense with the supplemental rail G and attach the bars F directly to the end rails, I I' in such manner as to be readily detached therefrom, in order to facilitate the rolling up of the spring portions for transportation.

"By an examination of the drawings it will be seen that the cut ends of the woven-wire fabric enter and are secured within

a throat formed between the upper and lower faces of the swinging bar D D', and that the springs or links which connect said bar to the end rail are attached to the bar at the edge opposite to that at which the woven wire enters the throat, and in about the same horizontal plane, so that the tension of the parts tends to maintain the bar in a substantially horizontal plane, thus presenting a suitable surface adapted to support the mattress without undue wear upon any portion of its lower surface. So, also, constructing the bar in such manner that it is adapted to receive a hook formed of one of the convolutions of the springs E facilitates the employment of such springs as they are usually found in the market, this result being best obtained by the employment of a strip of metal for one part of the bar D D'; but we do not wish to be limited to the use of metal for that purpose. One advantage which is due to the use of wood for this bar is the fact that its yielding and elastic nature permits attachment of the spring-wire of which the fabric C is formed, and the vibrations of the bar, when in use, without breaking their attached ends.

"By the use of the springs and swinging bars the great strain upon the woven fabric which is required in beds of other construction may be dispensed with, because the springs may be made of such strength as will permit the fabric to be supported with comparatively little tension upon it when the bed is not sustaining any weight except that of the bedding, the springs preventing undue sagging of the fabric when the weight of a person is thrown upon it.

"We do not wish to be limited to any particular description of springs for connecting the swinging bar or bars with the bedstead, or with the supporting frame shown in Fig. 2, as many other forms of springs might be employed without departing from the spirit of our invention.

"Whenever in this patent we use the word 'bed-bottom' or 'bed' we wish to be understood as meaning either a removable construction, like that shown in Fig. 4, which is adapted to be made and sold as an article of manufacture, separate and apart from the bedstead with which it is to be used, or a construction adapted to be attached directly to the end rails of an

ordinary bedstead, our invention being equally adapted for use upon either of such constructions."

The claims are three in number, as follows:

"1. In a bed-bottom, the combination, with an end rail, of the links or springs, the section of woven-wire fabric, and an intermediate connecting transverse bar, provided upon one edge with a throat adapted to receive the ends of a wire, and upon the opposite side with means for attaching the links or springs, substantially as described.

"2. In a bed-bottom, the combination, with the end rail, of the links or springs, the section of woven-wire fabric, and an intermediate connecting bar consisting of a part to which the fabric is attached, and a part adapted to protect the mattress from contact with the ends of the wire, substantially as set forth.

"3. In a bed-bottom, the connecting rail consisting of the part D, of wood, to which the fabric is attached, and the part D', of metal, adapted to have the end of the springs E attached thereto, substantially as set forth."

The opinion of the Circuit Court says: "The essential feature of the invention consists in attaching the woven-wire fabric to a swinging cross-bar, which in turn is suspended by helical springs from the end rails of the bedstead. The patentees assert that by this arrangement are secured all the advantages of a swinging bed — elasticity, durability, and resiliency — while sagging in the centre and the sudden jerky motion common in some bed-bottoms are avoided." It then recites the first two claims, and proceeds: "Every element of the combination covered by these claims was concededly old and well known at the date of the patent. Woven wire had been used for more than twenty-five years as a fabric for bed-bottoms. It had been stretched from end rail to end rail and fastened by means very similar to that described in the patent. Bed-bottoms made of canvas, cord, sacking, and jointed links attached to 'swing-bars' had been suspended by helical springs in analogous combinations. If, for instance, a fabric of woven-wire were substituted for the canvas of the Loomis structure, it would probably be an exact anticipation of the

complainant's combination." The "Loomis structure" thus referred to is the structure described in letters patent No. 101,029, granted March 22, 1870, to George W. Loomis, for an improved spring bed-bottom. The specification and drawings of the Loomis patent show a bed-bottom which has an intervening, vibrating, connecting swing-bar, the office of which is the same as in the plaintiff's patent, namely, to connect the web with the helical springs. The bed-bottom has a web of canvas, an intervening connecting bar, and helical springs. The web of canvas is fastened at both ends to the wooden swing cross-bars, which are attached to helical springs on the opposite sides.

The opinion of the Circuit Court then proceeds: "Is there patentable novelty in this change? It is thought not. If the patentees had been the first to introduce woven wire into the art, there would be more difficulty in reaching this conclusion, but they were not. All that they did was to suspend a fabric well known as a bed-bottom in substantially the same manner that other fabrics used for that purpose had been suspended. If the patentees, instead of using woven wire had used some other woven fabric — woven twine or tape, for example — if their claims had included carpet or rubber cloth instead of woven wire, it will hardly be contended that they would be entitled to take rank as inventors. Why, then, should the use of woven wire give them this distinction? Its peculiar advantages above referred to as a material for beds were not discovered by them. The idea of swinging a bed-bottom was not theirs. They have substituted one well-known material for another and nothing more."

The court also said that the same material had been fastened to the rigid end rails by similar devices, and that the changes made by the patentees were only those which would occur to a mechanic who had skill enough to adapt the heavy and cumbersome joint to the new circumstances.

We concur with the Circuit Court, and its decree is

*Affirmed.*