### VAN HEUSEN PRODUCTS, Inc., et al. v. EARL & WILSON.

### SAME v. CLUETT, PEABODY & CO., Inc.

(District Court, S. D. New York. July, 1924.)

1. **Patents ⬤≈328—1,383,693, for semi-soft collar, claim 1, held valid and infringed.**
   The Bolton patent, No. 1,383,693, for a collar, claim 1, which covers a collar of multiple-ply interwoven fabric, which by the closeness of the weave and the interweave is made sufficiently stiff to maintain its shape without the employment of starch, *held* not anticipated, valid, and infringed.

2. **Patents ⬤≈161—Patents which are of great benefit to the art liberally construed.**
   When they can see that there has been a new discovery of great benefit to the art, courts are liberal in the interpretation of disclosures and claims.

3. **Patents ⬤≈21—Substitution of materials may constitute invention.**
   The substitution of one material for another may constitute invention.

⬤≈For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Patents ⊜⇒52—Invention which in practice might unintentionally produce the result intended by a later patent not an anticipation.**

A patent is not anticipated by a prior patent for an invention which was not intended for the same purpose, though in practice it might accidentally produce the result intended by the later patent.

**5. Patents ⊜⇒328—1,383,694, for collar, claim 1, held valid and infringed.**

The Bolton patent, No. 1,383,694, for a collar, claim 1, *held* valid and infringed by certain of defendant's products, and not by others.

**6. Patents ⊜⇒328—1,309,379, for collar, held not infringed.**

The Van Heusen patent, No. 1,309,379, for a collar, *held* not infringed.

**7. Patents ⊜⇒328—1,352,705, for collar, held not infringed.**

The Van Heusen patent, No. 1,352,705, for a collar, *held* not infringed.

**8. Patents ⊜⇒328—1,352,706, for collar, held void for anticipation.**

The Van Heusen patent, No. 1,352,706, for a collar, *held* void for anticipation.

**9. Patents ⊜⇒83—An allowed application, permitted to lapse for nonpayment of fees, held not abandoned.**

The action of an assignee of an application for patent, which had been allowed, in permitting it to lapse for nonpayment of fees, and in pressing to issue a later application, assuming that the two contained common claims, *held* not to prove an abandonment of the lapsed claims, which invalidated the patent therefor issued on their revival.

**10. Patents ⊜⇒110—Revival of allowed application after lapse in name of inventor, instead of assignee, held not to invalidate the patent.**

A patent *held* not invalidated, because renewal of the application after its allowance and lapse was made in name of inventor, instead of the assignee.

**11. Patents ⊜⇒109—Assignee may supply formal omissions from specification.**

Omission from the specification in an application of a statement of the citizenship of the applicant may be supplied by an assignee.

**12. Patents ⊜⇒120—Defense of double patenting not applicable between independent inventors.**

The defense of double patenting does not apply between independent inventors, merely because one has taken an assignment of the other invention.

In Equity. Suits by the Van Heusen Products, Inc., and the Phillips-Jones Corporation against Earl & Wilson and against Cluett, Peabody & Co., Inc. Decrees for complainants, granting partial relief, and bills dismissed in part.

See, also, 300 Fed. 936.

Bill in equity for the infringement of five patents, all for the manufacture of collars, as follows: Patents Nos. 1,383,693, and 1,383,694, to John Blakeslee Bolton, each issued July 5, 1921, patent No. 1,309,379 issued to John M. Van Heusen on July 8, 1919, and patents Nos. 1,352,705 and 1,352,706, issued to the same person, each on September 14, 1920. The invention relates to what is known in the trade as "semi-soft" collars, which are intended to be laundered with little or no starch, and yet so far as may be to maintain the same appearance as the ordinary starched collars. The claims in suit are claim 1 of each of the Bolton patents, claims 1, 2, 3, and 4 of Van Heusen's patent No. 1,309,379, claims 1 and 2 of Van Heusen's patent No. 1,352,705, and 1 and 3 of his patent No. 1,352,706.

Charles Neave and Merrell E. Clark, both of New York City (Frank C. Curtis, of Troy, N. Y., of counsel), for plaintiff.

Odin Roberts, of Boston, Mass., and Livingston Gifford and Drury W. Cooper, both of New York City, for defendants.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

LEARNED HAND, District Judge. It seems to me best to approach this case by inquiring first whether the conceded success of both the plaintiffs' and the defendants' collars is due to some invention common to both, afterwards to inquire whether that invention is to be found in any of the patents in suit, and finally whether it had earlier appeared in the art and was overlooked. The first question is easily answered. Van Heusen's collars appeared in April, 1921, and almost at once got a vogue which puts it beyond any doubt that they indeed answered the proverbial long felt want. This conclusion is corroborated by the history of the art.

The soft, unstarched collar is over 20 years old, and people were then trying to reinforce it, so that it might be stiffer and less untidy, while at the same time it should remain comfortable to the neck. This appears from patent No. 699,847 to Nichols, which was for a hair-cloth support in the neckband, and was applied for on October 23, 1901. The art tried other devices besides Nichols's hair cloth to accomplish the same result, as by the insertion of a celluloid slip, Lord, No. 826,177 (July 17, 1906); Heery, No. 945,164 (January 4, 1910); Quigley, No. 962,665 (June 28, 1910). These were obviously troublesome and awkward and other kinds of stiffeners were used, for example, Bristol, 1,069,760 (August 12, 1913), which contained an irregular metal V in the front; Quigley, No. 1,091,017 (March 24, 1914), which had local reinforcements at the buttonholes; or Robinson, No. 1,112,033 (September 29, 1914).

Several of the foregoing were assigned to the defendants here in suit, but none of them ever became popular. All these were conceived before Bolton made his application, but other attempts were made later, and before 1921, as is shown in the patents to Glaxon, No. 1,170,243; McKay, No. 1,200,381; Gorman, No. 1,218,254; Renihan, No. 1,223,521; Turrell, No. 1,243,463; Pine, No. 1,253,418; Becker, No. 1,276,480; Hurd and Wright, No. 1,287,324; Spingarn, No. 1,294,843; and Hemmick, No. 1,363,871. These also ring the changes upon stiffeners of one sort or another, of different materials, permanent or removable. It is clear that in such a field the winner has not expounded a text which he who runs may read.

As I have said, Van Heusen's collars appeared in April of 1921. Before the year was out his success made it industrially necessary for the defendants to put on the market the present alleged infringements, which were quite new in their manufacture, and from that time forward the "semi-soft" collars began to drive the older "soft" collars off the market. Indeed, their fashion has become a matter, not of competition, but of elimination; the soft collar as an article of wear is clearly doomed. This was accomplished without any unusual cost of advertising; the plaintiff's expenses for this purpose were no greater than for starched collars, and were small indeed, considering that a newly commodity was being introduced. Something had obviously occurred in the collar industry of major importance. For reasons, real or fancied, the public had at length found a collar which suited its needs as nothing else had done theretofore. The business grew enormously in the succeeding three years, and has indeed somewhat invaded the starched collar industry itself.

To any one in the least familiar with patents it must be evident that an invention of high merit had appeared in this art, and that it was contained in the collars which Van Heusen put out in April of 1921. It is quite idle by logistic niceties to try to obscure this outstanding fact. Bolton may not have conceived it; Bolton may not have disclosed it; Bolton may not have claimed it; Van Heusen may have abandoned it; but the public had got something which it had been wanting for 20 years, and which after repeated efforts nobody had found before. The defendants recognized this at once, and trimmed their sails to the prevailing wind, as they had to. Being the most experienced manufacturers in the art, I may safely assume that they quickly learned what was kernel and what was shell, what to discard and what to keep. They argue that it was Van Heusen's weakened fold line, or his curvilinear weave, or the other details of his structure which hit the popular fancy; but I prefer to accept the evidence of their conduct, not alone because it is more disinterested, but because their successful inroads upon Van Heusen's market corroborate the accuracy of their insight as to what had brought success. I am safe in fixing the real invention in those qualities which the present collars all have in common, and which earlier collars had not, and by earlier collars I mean those which had actually been marketed in quantity and were not merely disclosed in the Patent Office.

Nobody can doubt that this common quality was in the use of multiple-ply interwoven fabric in the neckband or in the flap, closely enough woven to make it stiff. This Van Heusen's collars all had; this the defendant's collars all have; this no previous collar put upon the market ever had, as I shall try to show later. Like many other striking inventions, it rests upon so simple and obvious an idea that its assertion arouses only contempt for its claims to originality until success has made it formidable.

[1] It becomes necessary, then, to consider how far Bolton had arrived at any such notion, and whether his most generic claim goes so far. It is really only his first patent which matters, because his second is easy to evade, and success upon it would help the plaintiff very little. At the very outset among the purposes of his invention he says (page 1, lines 14–20): "The invention provides a collar of multiple-ply interwoven fabric *which is sufficiently stiff* to maintain its shape without the employment of starch, and is nevertheless sufficiently pliable to assume the necessary curvatures to fit the neck of the wearer without undue rigidity." This statement alone is nearly, if not quite, enough disclosure, as the art found. He had other objects as well, but they were secondary, and need not concern me here. This "multiple-ply interwoven fabric," of which he speaks, was already well understood in the art, and used for many other purposes. All the plies are woven at the same time, the "layers forming substantially a single entity by reason of the weaving at intervals of threads with adjacent layers into each other" (page 1, lines 99–103).

It is clear that Bolton supposed that the inherent stiffness of the fabric so produced might not, and probably would not, alone be enough to produce what he wanted. In any event, he described in the main

portion of his patent (page 2, lines 18–22) that "one of the layers * * * is provided with reinforcing threads of such a character that they will take on and maintain a more or less permanent set," and he suggested for such reinforcing threads very fine copper wire with a coating of spun fiber. These were to run occasionally alongside of a horizontal weft thread, "to insure the permanence of that curvature," and were thus to encircle the neck. I agree that, in the passage (page 3, lines 12–25) in which he describes what is "broadly new" in his invention, he is still speaking of a horizontal thread of some material other than the yarn out of which the collar is woven. Indeed, were it not for the passage at the outset already quoted, for the concluding paragraph of his specifications (page 3, lines 31–39), and for some of his claims, I should not have found anything in his disclosure which would serve the plaintiff in this suit.

First let me consider the claims, and then whether the specification will support them. Claims 5 and 6 are, it is true, drawn for the feature of the weakened fold line; but they must read none the less upon this patent, which we must always remember is for collars that will stand unstarched. These claims do not prescribe any threads which are not of yarn, nor does the weakened fold line help them to stand up, so far as appears. Such collars might then be merely of multiple-ply interwoven fabric, and Bolton must have supposed that this alone would answer his demands. The same thing applies to claims 10, 11 and 12. Claim 9 is not so clear, because the "reinforcing layer" is distinguished from the "intermediate layer," and it is hard to see why it "reinforces" the collar more than the other. It is perhaps fair to argue that Bolton meant by it a layer having a longitudinal thread which was other than yarn.

There remain claims 1, 2, 3, and 4. It is quite inadmissible to suppose that any of these can refer to "single" as against "composite" fabrics, merely because of the mention of both at line 14 of page 3; because the patent is for multiple-ply interwoven fabrics alone. So much admitted, it is a matter of mere formal logic to show that claim 1 could never have been meant to prescribe any reinforcing threads of a material other than yarn. This chain of claims proceeds uniformly from genus to species by cumulative differentiation according to a very simple logical form. Let me first compare claim 3 with claim 4; they are the same, except that the reinforcing copper wire of claim 3 in claim 4 becomes a species—i. e., such wire coated with spun fiber. Next compare claim 2 with claim 3. The "reinforce" of claim 2, which must be of "longitudinal threads of pliable material," certainly some other material than yarn, becomes a species of such material; i. e., copper wire. Then take up the last step in this retrogression and compare claim 1 with claim 2. It differs only in that the reinforce need not be composed of "longitudinal threads of pliable" (heterogeneous) "material."

What else within the compass of the disclosure can it be composed of? Claim 2 covers all other suitable materials than yarn, and by hypothesis it cannot include yarn, or the claim would cover all that claim 1 covers. Claim 2 must under the plainest canon be the more

specific, and, if so, claim 1 must cover the fabric itself, a fabric in which the reinforce can only be the backing of the added plies, because nothing else is disclosed. The claim can refer only to the opening and the concluding paragraphs of the specifications, and was meant, no doubt, to cover all that those paragraphs described, if they described anything at all, which I shall consider later.

The defendants argue that the word "reinforce" as defined in the patent—and it is not a word of art at all—precludes the conclusion that it may mean only a second or other ply of the fabric. The noun is not once used in the specifications, only the adjective "reinforcing," though that does indeed always refer to heterogeneous threads, or to the layer or ply containing such threads. Outside of the first four claims, the word appears only in claims 7 and 8, and then in the phrase, "a third layer constituting a reinforce *and* provided with longitudinal threads," etc. The use of the copula may be not without significance, as though one might have a "reinforce" without such threads. At least one may legitimately observe that, as the first four claims use it in a way which forbids the meaning which the defendants wish, the other claims use it consistently with the first. The defendants' argument loses its force, unless we are bound to interpret the adjective and the noun as identical, which we are not. So much, then, for the first point as to infringement.

The second is more easily disposed of. It is incredible that the patentee should have been concerned with maintaining his collars in curved form when off the neck. Every one knows that this is a nuisance in the case of starched collars, and to impute so fatuous a purpose to the claim is unwarranted. The clause has a quite natural meaning, as Mr. Neave observes. When a soft collar breaks down, it is because the horizontal sections through it have changed their form or their relation to one another. When in place, these sections have all in general a circular form, making roughly a cylinder in the neckband, and the frustum of a cone in the flap. So long as these sections retain their form and relation, the collar will be stiff. When it breaks, a vertical section of the collar ceases to be a straight line only because the horizontal sections have at some point in their circumference failed to maintain the curvilinear set or generally circular form which they had at the beginning. At least they must be displaced in relation to one another. I question whether the last may happen without the first. This is all that the claim means, and, though it is obscure, it is accurate.

Next comes the question whether the specifications will support such a claim. I agree that as to this I am confined to Bolton's first patent, and that in that patent I have nothing to look to except the general use of the fabric in question, as stated at the outset, and the concluding paragraph I have already mentioned. The disclosure really comes to this: You may get a starchless collar as stiff as you need by using a multiple-ply interwoven fabric without stiffeners. The defendants' argument is plausible that this gives one no guide as to how such a collar can in fact be made, and that it is absurd merely to throw the material upon the maker's lap and assure him that he may make

a stiff enough collar out of it. Unless such a fabric will inexorably produce such a collar, which would run the patentee into difficulties with the prior art, the patent must disclose how it is to be done. Either the specifications are defective, or the prior art applies. It is this dilemma which the defendants present to the validity of the claim, construed as I have construed it.

I will approach this question first from the disclosure in Bolton's second patent, not, as I have said, because it can be read with the first, but to see how much more it was really necessary to tell the art than that stiff enough collars could be made from the designated fabric. The concluding statement in those specifications (page 2, lines 38–44) comes to this: That the stiffness of the collar depends upon the closeness of the weave and of the interweave. As Bolton was addressing weavers, and weavers know that the closeness of the weave affects the stiffness of the fabric, was this not enough, and could he have said anything more which would have helped? There was no way to prescribe what closeness was necessary; the most he could do was to say that that kind of fabric might be made to serve by making a close weave and interweave.

Now it is certain that Bolton had no different purpose in the two patents, and supposed that he was saying in substance the same thing in each. Perhaps he was wrong, but he was a weaver himself, and I suppose he must have instructed his solicitor, or at least have studied the specifications personally. Was he, then, wrong in assuming that to a weaver it is all one whether you say that a stiff enough collar can be made out of the fabric of his selection, or that such a collar can be made from such a fabric by a close weave and interweave? He was wrong only in case a weaver would not know from his art what would be the effect of varying the closeness of the weave. The patent is presumably sufficient, and I am aware of no evidence to show that this was not common property of the weaver's art. Indeed, it must have been. Variations in closeness of weaving were of course understood, and with them their effects. It seems to me that, in saying that you could get the collar stiff enough, he implicitly said the same thing in the first patent as he expressly said in the second.

The art found it enough in any case, because, though Van Heusen, who was no weaver, and knew nothing of the subject, was discouraged with the gross results, it was from Bolton's specifications alone that success arose, measured as the defendants rightly measure it. Bowen and Morgan worked out other details, which the defendants have not found it necessary to follow. If it was not Bolton, it was some nameless inventor, who has not come forward to claim his prize. Granting that more was necessary than Bolton actually performed, and that he builded better than he knew, it was his disclosure, and his alone, that proved enough in the hands of ordinary persons to practice the invention. But that, I submit, is itself a sufficient definition of invention. His idea in the hands of the skilled collar maker made the defendants' collars, without further clue. Therefore I think that the claim covers any starchless collar containing a multiple-ply interwoven fabric closely enough woven and interwoven to make the

collar hold its form.   Further, I think that it is supported by adequate specifications.

[2] When they can see that there has been a new discovery of great benefit to the art, courts are liberal in the interpretation of disclosures and claims.   Eibel Process Co. v. Minn. & Ont. Paper Co., 261 U. S. 45, 43 Sup. Ct. 322, 67 L. Ed. 523; Barrell v. Fitchburg Duck Mill (D. C.) 207 Fed. 371 (C. C. A. 1) 214 Fed. 777, 131 C. C. A. 189; George Frost Co. v. Cohn (C. C. A. 2) 119 Fed. 505, 56 C. C. A. 185; H. D. Smith & Co. v. Peck, etc., Co. (C. C. A. 2) 262 Fed. 415.   The case at bar seems to me to require no greater latitude of interpretation than has often been assumed under similar circumstances.

[3] I am faced with the usual collection of cases to prove that it is never invention to substitute one material for another.   Cases like Hotchkiss v. Greenwood, 11 How. 248, 13 L. Ed. 683, Ryan v. Hard, 145 U. S. 241, 12 Sup. Ct. 919, 36 L. Ed. 691, and Lovell Mfg. Co. v. Cary, 147 U. S. 623, 13 Sup. Ct. 472, 37 L. Ed. 307, might indeed be piled up indefinitely.   I do not conceive that the law has ever laid down any such absolute rule on this subject, or any other absolutes for that matter.   The prospect of getting objective tests for invention is tempting, but it is a mirage.   How is it possible to say a priori what combination of elements needs an original twist of the mind, and what is within the compass of the ordinary clod?   Is it not clear that the quality of a man's inventiveness must be tested by reconstituting the situation as it was in the light of the preceding history of the art?   There is no vade mecum for such inquiries. Our unknown ancestor, who first substituted iron for bronze in the head of an ax, was the bright exemplar of all inventors to come.   Yet it was not an invention, if one is bound by this objective test.   In this subject the standard escapes any abstract definition, because the end in view needs nicer adaptations, as in the cases of due care or notice. The defect of such a standard is indeed its uncertainty, but certainty is only one of the ends of law.

One case, however, must be noticed, because on the facts it appears so close to this, though it is not in fact. I mean Collar Co. v. Van Heusen, 23 Wall. 530, 23 L. Ed. 128.   In that case Evans claimed to have invented a new kind of paper collar, made of long fiber paper, for which he claimed a patent.   It appeared that he knew nothing of the kind of paper which he wanted, and did not even select it himself, but, having advised the manufacturers of his needs, used the paper which they furnished.   It was very naturally held that he could claim no monopoly for any such discovery, because it was not his own. The case seems to me the same as though Van Heusen had here filed the application.

[4] There remains, therefore, only the question of anticipation. The best reference is Willard's invention.   Willard was a Frenchman, and took out patents in the United States, Germany, the United Kingdom, and France, during the years 1903 and 1904.   As appears in his French patent, he had no idea of a starchless collar, and the art learned nothing from his patents of how such a collar could be made.   How-

ever, it is quite true that, if he disclosed all that was necessary to make such a collar, it was no invention for another to reinvent it, and use it for another purpose than Willard had perceived. For the defendants' purposes his German patent is the best, and for that reason I shall consider it. Much testimony was taken as to the character of the weave there exhibited, and my conclusion is that, in that part of the neckband where the buttonholes are not, he showed what to an expert weaver would have been a multiple-ply interwoven fabric substantially like Bolton's. I attach no importance to the line of squares on the left and right of sections *G* and *D* of his Figure 5, because I believe that in practice any one would at once have perceived that a weaver could not have intended these to be in the pattern. Nor do I again attach importance to the triplication of weft threads in the face and rear layers, though this would have produced a finely ribbed structure. Bolton's patent I have treated broadly, and it may not stand on such fine distinctions as these. A finely ribbed collar is still a collar, and the art knew how to make an even texture when it would.

Again there is no doubt that Figure 4 of this patent, which is reproduced in the United States and British patent, represented a standing collar, and that the interwoven portion was over the whole of it, except at the split ends, which were to be turned in and stitched. Therefore I regard the disclosure as truly representing a collar, the whole of which was made of a multiple-ply interwoven fabric similar to that which Bolton disclosed. What, then, it is very properly asked, is there left of Bolton's invention, if it be so broadly construed as the plaintiff must construe it? Is the patent to depend wholly upon a new use to which such a fabric should be put? Is it not a well-settled part of the law of patents that new uses are not patentable?

To this I answer that, if it were true that any multiple-ply interwoven fabric made into a collar would, in Bolton's words, inevitably "maintain its shape without the employment of starch," I should say that Willard's disclosures were an anticipation, because one had only to practice it as it reads and one would get the present collar. But this is not the truth. Willard had no such purpose in mind, and one might go on forever following his patents, without ever making a starchless stiff collar. True, one might by accident hit upon a properly close weave and interweave, but it would only be by accident. To be a proper anticipation, a reference must go further than that; it must tell you how you can get with certainty the result you are after.

The criticism of Bolton's own patent is indeed plausible, just because in this respect his disclosure is so scanty, though, for the reasons I have given, it does not persuade me. But as respects Willard I have no doubts whatever. He at least said nothing about getting a stiff collar, and it was hit or miss, if you followed him, what you would get. That will not do for an anticipation. Eibel Process Co. v. Minn., etc., Co., 261 U. S. 45, 43 Sup. Ct. 322, 67 L. Ed. 523; Pyrene Mfg. Co. v. Boyce (C. C. A. 3) 292 Fed. 480. The principle, as Judge Woolley says, is akin to that of a lost art (Gayler v. Wilder, 10 How. 477, 13 L. Ed. 504), because that which casually appears without any conscious direction will not reappear, except under the doctrine of chances. Nobody is the better for it, because nobody

knows how to get it again, till some one arrives who not only makes the thing, but wants to make it, and knows that he has made it. Wickelman v. A. B. Dick Co. (C. C. A. 2) 88 Fed. 264, 31 C. C. A. 530; Hillard v. Fisher Typewriter Co. (C. C. A. 2) 159 Fed. 439, 86 C. C. A. 469.

I may dispose of Cummock's patents and prior uses in the same way. Allowing that he actually produced a multiple-ply interwoven fabric, it was not a stiff, starchless collar. He was not after anything of the kind, and unless his method was bound to produce them, he did not anticipate Bolton.

It hardly seems necessary, in view of the foregoing, to discuss those collars of which the defendants proved the manufacture, which, even if the face was a multiple-ply interwoven fabric, were backed by separate pieces of cloth or linings, especially when, as, for example, in Defendants' Exhibit 33, they have stiffening pieces at the buttonholes. All such, like Willard and Cummock, only help to prove the plaintiff's case, because they show that it had never before occurred to any one that such a fabric of itself might form a stiff starchless collar. Bolton was the first to conceive of this, and Bolton must win.

Finally, therefore, I find that Bolton's first claim of his first patent is valid, and infringed by any collar which in band or flap consists solely of a multiple-ply interwoven fabric, so closely woven and interwoven that it will maintain its curvilinear set substantially without starch. All the alleged infringements are covered by this claim. I reserve for the time being the technical defenses to this patent, such as the sufficiency of the oath, double-patenting, and abandonment.

[5] Clearly, what I have said disposes of Bolton's second patent, except as to the matter of infringement. The only collars covered by this claim are those which are made of a three-ply fabric. I have not before me any drawing which shows such, but counsel will be able to agree upon which do or do not fall within the claim.

[6] The next patent is Van Heusen's No. 1,309,379. In view of the specifications, which uniformly show two-piece collars, I attach no significance to the phrase, "secured together at the upper edge of the neckband," and claim 1 is distinguished from claim 2 only by the fact that in the first there must be an "integral heavy fabric," while in the second there must be a "multi-ply fabric." I think that nothing infringes claim 1 but a heavy single ply, and that the distinction in the claim carries out that of the specifications (page 1, lines 40, 41). The same distinction, even more clearly, is all that divides claim 3 from claim 4. As all the alleged infringements on Exhibit 31 are multiply, I hold claims 1 and 3 not infringed, because they do not contain what the patentee meant, either by "an integral heavy fabric" or "a single unitary fabric." This is, of course, of no moment, if claims 2 and 4 are valid and infringed.

Van Heusen, to support these claims, must show that they are patentable variations upon Bolton's basic invention; that is to say, he may not rely upon the novelty of the fabric which Bolton first used for collars. This follows, because the claims have the relation of species to genus; all the elements of Bolton's invention, being com-

prised in Van Heusen's claims 2 and 4, and more as well. If Van Heusen's claims could be valid, although the addition of the differentia constituting his claims species, did not require invention, it would follow that Bolton and his licensees would be prevented from using certain embodiments of his invention which anyone could invent. In short, he would be partly shut out from the exploitation of his own patent. It is only when the new variation itself requires invention that this can be true. This is not in contradiction with the doctrine of Davis-Bournonville Co. v. Alexander Milburn Co. (C. C. A. 2) 1 Fed. (2d) ——, which only holds that in determining the validity of the claims of a later application, a copending application may not be considered as an anticipation. The effect as between genus and species is indeed the same as though the genus was part of the prior art, but this is for reasons which in no wise conflict with that decision.

So considered, I do not think that either claim is valid, unless the phrases "of appropriate form to give the desired shape" and "having a shape which will give the desired shape to the collar," refer to a curved weave, or unless they are confined to collars in two parts. If interpreted more broadly, claim 2 merely means that one part of the collar must be of multiple-ply fabric and be cut to fit the neck, and claim 4 means that the neckband must also be of multiple-ply, must also be so cut, and that its upper edge must be the upper edge of the collar. At least I have not the least idea what "conforming" means, if it does not mean that.

Given the new fabric, everybody knew how to cut a collar to fit the neck, and the two claims are for nothing but making collars in whole or in part out of such fabric, so cut as to fit the neck, and perhaps made in two pieces. This is no invention at all, so interpreted, and the bill must fail in respect of it. Perhaps it is best, on the principle, "ut res magis," merely to say that the claims are not infringed, if they are valid, leaving it to the patentee to assert their validity, if he can, should any one wish to copy his curved weave line. The bill will be dismissed as to all four claims for lack of infringement.

[7] Of the last two Van Heusen patents, the earlier in number is for an added band outside the neckband, from bottom to top, where the band is doubled to form a fold line, over which the flap may fall. The patent later in number is for a small fold band, just at the top of the neckband, for the same purpose. Both patents presuppose that the whole collar, neckband and flap, is to be made of multiple-ply interwoven fabric. The applications were filed together, and the patents issued on the same day. The first claims are easily disposed of, because none of the defendants' collars infringe them. The two patents must be distinguished to avoid double patenting, and the first must be limited to a lining running the whole depth of the neckband. If the phrase "one or more added plies forming part of the neckband portion" covers the "Sagelawn," "Oaklawn," or "Service 1" collars, then it covers a strip similar to that disclosed in the patent later in number. The same is even more clearly true of the phrase in claim 2, "an additional layer of fabric secured to the neckband." The bill will be dismissed for noninfringement as to this patent.

[8] The patent of later number is in any event anticipated, so that I need not trouble with the meaning of the claims, and therefore with the question of infringement. It is for a narrow fold-over strip outside of the neckband, to make a proper fold line. Bevington's patent, No. 939,204, entirely disposes of any invention in the claims in suit. Bevington made a collar of two faces, both band and flap struck out of a single piece of cloth. One might have a lining or not at will, but the claims were for one or two narrow strips curved to fit the neck, one at the top of the neckband, and the other at the top of the flap. These were to insure the proper fold line when the collar was turned. Claim 1 was for a single "guide strip," claim 2 for both. The only difference between this patent and Van Heusen's claims is that he adds such a strip to the outside of a multiple-ply neckband, instead of within the two separate plies of a double-ply collar. The purpose of the band is in each case exactly the same, to insure a proper fold line when the flap is bent over.

Given Bolton's collar, there seems to me no invention in using upon it the same strip as Bevington used. The fact that Bevington put the strip between the bands is probably accounted for by his desire to make his collar reversible, one of those pathetic efforts to avoid the destruction inevitable in frequent recourse to the laundry. But, whatever was his purpose, it is as little invention to transfer the fold strip from the inside to the outside, as it is to transfer it to a multiple-ply interwoven fabric. The bill is dismissed for invalidity as to these claims.

[9] I have, then, left only the question whether Bolton's patents are void, because of some one of the technical defenses raised by the defendants. The first of these is abandonment. The argument runs as follows: Van Heusen's solicitors got Bolton's claims allowed in 1917, and let them lapse under Revised Statutes, § 4885 (Comp. St. § 9429), for failure to pay the fees. Before these claims were allowed, he had filed his own applications, which resulted in patents Nos. 1,-307,425 and 1,309,379. These last he pressed to issue after Bolton's claims had lapsed, and after they issued he revived the lapsed claims. There are claims in these later patents which are as broad as some of Bolton's claims. Van Heusen could not have meant to take out two claims for the same invention on two separate applications. As Bolton's claims had lapsed when he took out the later patents, he must have meant to abandon them, and Revised Statutes, § 4886 (Comp. St. § 9430), applies.

This defense is a little ambiguous, and may mean one of two things: First, it may mean that Van Heusen's conduct should forfeit his right to the Bolton claims, because it was a perversion of the statute; this might be phrased as an abandonment, but it would be an imputed abandonment, or abandonment by operation of law. Second, it might mean that by pressing the later patents to issue Van Heusen meant actually to abandon the Bolton applications.

As respects the first argument, there is no rule of law which I know that imposes upon an assignee any such alternative as the defendants seek to impose here. I am assuming that these patents had in part substantially similar claims to those allowed to Bolton. In that

event, if the later application came out first, and the earlier application second, the second would still be the only valid patent. It is true that by hypothesis the same claim would meanwhile have enjoyed the protection of the earlier patent of later discovery, and that in consequence the monopoly would have commenced sooner than it lawfully should. But I know of no way by which the second patent could be declared invalid, merely because the first had been fraudulently procured. In any event, it would be absurd to say that the second had been abandoned, because the supposed purpose was just the opposite. Of course, if a deliberate scheme of that sort would not invalidate the later patent, a fortiori the same acts would not affect it, if they occurred innocently and from a failure to observe the similarity of the claims. I shall assume, therefore, that what defendants mean by this defense is a deliberate or conscious abandonment.

It seems to me altogether unreasonable, merely because there were claims in substance common to the patents and the allowed claims, to infer that the prosecution of the patents was an abandonment of the claims. In the first place, even if Van Heusen at that time intended not to press the allowed claims to issue, that would not be an abandonment, because only an overt act, not a mere state of mind, may be that. The most the defendants could say would be that to prosecute the patents was evidence of such a state of mind. They must go further, and prove that the act of prosecution was itself an abandonment, which means that the normal significance of that act would be that the owner of the allowed claims meant to give them up. I think that the prosecution of the patents may not reasonably be understood as referring to the allowed claims in any way whatever.

But suppose I am wrong, and that the owner of an invention may abandon it by merely entertaining the idea, still I do not think that the prosecution of the patents was any evidence of an intent to abandon. My guess would be that Van Heusen meant to spread Bolton's invention over the art as thin as possible, so as to cover all he could. He either thought claim 1 of each Bolton patent was limited to a heterogeneous reinforcing thread, or he did not. If he did, then (to consider Bolton's first patent) claim 1 was like claims 2, 3, 4, 7, and 8. It was a quite separate invention. He might have thought it of small value; indeed, I believe he did. But it casts none but the dimmest light upon his purpose of prosecuting these claims that he procured the issue of his other patents. He might still have wanted to take out these claims for what they might be worth, for he was apparently patenting everything within his reach. A contrary conclusion would be the merest guess.

Or Van Heusen might have thought claim 1 to be basic. If so, it is extremely unlikely that he should have ever intended to abandon it. Certainly it is cast in broader language than any claim in patents Nos. 1,307,425 and 1,309,379, all of which, at least in form, are circumscribed with conditions and limitations. Such a conclusion would be still more a speculative guess. The truth is that the defendants really wish me to impute such an intent to him, on the theory that only so can all his acts be legal. Such an imputation would be a pure fiction, and I will not make it when I am trying to discover a fact.

To conclude, therefore, I find that Van Heusen abandoned nothing, because abandonment means the expression of a purpose to abandon; that, if it means merely an unexpressed state of mind, it is impossible to say whether he meant to abandon the Bolton claims or not; that, outside of some actual abandonment, it is no defense to Bolton's claims, even though Van Heusen had actually intended to secure both Bolton's claims and his own, and unlawfully to extend his monopoly. Finally, this discussion has assumed two things, which I do not mean to decide: First, that the issue is re-examinable here; and, second, that the claims are in any part the same. Neither of these questions need be answered.

[10] The next defense raised is that the renewal, in accordance with Patent Office practice, was made, not in Van Heusen's, but in Bolton's name. Bolton had no pecuniary interest in the invention at the time, and perhaps did not fall within the language of Rev. St. § 4897 (Comp. St. § 9443), as entitled to renew the application. It makes, in my judgment, not the slightest difference whether or not he did, or whether the renewal was made in his name or in Van Heusen's. In fact, it was Van Heusen who renewed, and he was entitled to do so under the statute. Whether he did so in his own name, or in the inventor's, appears to me mere question of form. The statute does not say in whose name the renewal shall be made, but only who may make it. The Patent Office practice is perhaps desirable, because the inventor must make all such applications as involve facts touching the validity of the invention, since his oath is required (section 4895 [Comp. St. § 9439]), unless he be dead. It is as well to have the formal renewal also made in his name, but I see nothing vital in the name, so long as the true applicant is the party in interest.

[11] The last point is the failure of Bolton to state his allegiance in the original application. This statement since 1870 is no longer made in the oath, but in the body of the specifications. The oath does not verify the truth of the specifications in this respect, nor incorporate them in itself. It should merely contain the necessary statutory allegations as to the invention proper. The question is whether a true statement of the inventor's allegiance, not required to be under oath, may be inserted by the assignee, when he has reasonable ground to suppose that the inventor will not make the amendment. Child v. Adams, Fed. Cas. No. 2,673, was decided at a time when the allegiance was required to be stated under oath. There was a purpose in this, as it made a difference in the amount of the filing fee, and in the exploitation of the invention. The point has apparently never been raised again, save in Tonduer v. Chambers (C. C.) 37 Fed. 333, where Judge Acheson held that an innocent mistake in the citizenship of a patentee does not affect the validity of the patent.

I suppose it is now too late to hold, with Mr. Justice Story in Whittemore v. Cutter, Fed. Cas. No. 17,600, and Judge Clarke in Crompton v. Belknap Mills, Fed. Cas. No. 3,406, that the oath is of no consequence as respects the validity of a patent, once it is granted. Changes in the specifications require oaths, and courts have invalidated patents because they were absent. But it is not too late to say that, where a statement in the specifications need not be sworn to, any one

in interest may supply an omission or correct a mistake in formal matters. I can only add to what Judge Acheson has said that, in my judgment, it would be a blemish upon the law if it were otherwise.

[12] The final defense, so far as concerns the Bolton patents, is that they are an instance of double patenting, as against Van Heusen's own patents, Nos. 1,309,379, 1,307,425, 1,352,705, and 1,352,706. There is no case in the books to which I have been referred which holds that the defense of double patenting applies between two independent inventors, merely because one has taken an assignment of the other invention. Nor is there any reason on principle to hold anything of the sort. The assignment makes no difference; each patent standing precisely as if there had been none such. The earlier inventor should and will prevail, if the inventions are the same; if they are different, both ought to stand. The only reason whatever for the defense of double patenting is that, since the inventor is the same in each, the defense could not succeed that the inventor of the second was not the first inventor. He is the same inventor of each, but it is obviously not the purpose of the statute that he should in this way extend the term of his monopoly. He must be content with a single period of seventeen years. He would have to be content with nothing whatever by the terms of the statute itself, if he were not the first inventor at all.

The plaintiff may take a decree under claim 1 of the first Bolton patent against all the alleged infringements, and upon claim 1 of the second as indicated. Bill dismissed as to all the Van Heusen patents. No costs.